Daniel B. Olmos (CABN 235319)
Huan-Ting Wu (CABN 334851)

**NOLAN BARTON OLMOS & LUCIANO LLP**

600 University Avenue
Palo Alto | CA | 94301
T 650.326.2980 | F 650.326.9704
(e) dolmos@nbo.law
(e) twu@nbo.law

Attorneys for Defendant
Danhong "Jean" Chen

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES<br><br>  Plaintiff,<br><br>  v.<br><br>DANHONG "JEAN" CHEN<br><br>  Defendant. | Case No.: 5:19-cr-00111-BLF<br><br>**OBJECTION TO MAGISTRATE JUDGE'S DETENTION ORDER; MOTION FOR REVOCATION OF DETENTION ORDER PURSUANT TO 18 U.S.C. § 3145(B)** |

Defendant Danhong "Jean" Chen hereby objects to the Magistrate Judge's March 31, 2025, detention order as well as to the Judge's June 3, 2025, order denying Ms. Chen's motion for bail review, and moves this Court for a revocation of the detention order pursuant to 18 U.S.C. § 3145(b). *See* Dkt. 134, 148.

Ms. Chen is a 60-year-old United States citizen with no criminal history outside the charges in the instant case. She has been a licensed attorney since 1998 and, beginning in 2002, had her own immigration law firm in Downtown San Jose for almost 20 years where she employed dozens of people and represented thousands of clients. Ms. Chen's primary residence is

a multi-million dollar home in Atherton, the deed for which she is willing to pledge to secure her continued appearance in this Court, and in which she is willing to submit to house arrest during the pendency of this prosecution. Ms. Chen also has a daughter who is also a native-born United States citizen, was raised in the Peninsula, and attends U.C. Berkeley; she has submitted a letter in support of her mother's release. Moreover, Ms. Chen's co-defendant in this case, her ex-husband Jianyun "Tony" Ye, previously pled guilty and received a 12-month prison sentence. Ms. Chen has been in continuous custody in this matter since she was arrested in April 2024 in Kyrgyzstan pursuant to a Red Notice based upon the sealed Indictment, and she was detained for approximately 11 months in a Kyrgyzstani prison before being extradited to the United States this March. Thus, she has already accumulated more than 14 months of actual custodial time in this case, leaving her little incentive to flee from a prosecution for which she has likely already served the majority, if not more, of any sentence that might reasonably be imposed. Finally, before Ms. Chen was detained in Kyrgyzstan, she was actively participating in related SEC litigation in the Northern District of California, including agreeing to submit to a deposition in countries with extradition treaties with the United States to which she could safely travel given serious medical issues that are discussed more fully below.

Ms. Chen is entitled to reasonable release conditions under the Bail Reform Act that will allow her meaningfully to participate in her defense in this case. If she remains detained, she will face a Hobson's Choice – between exercising her Constitutional right to a fair trial and pleading guilty simply to get out of custody. *See, e.g.*, Samuel R. Wiseman, "Pretrial Detention and the Right to be Monitored, 123 Yale L.J. 1344, 1356 (2014) ("In some cases, the periods that defendants spend in jail awaiting trial is comparable to, or even greater than, their potential sentences, thus substantially incentivizing quick plea deals regardless of guilt or innocence."); Sacks, Meghan, and Alissa R. Ackerman. "Pretrial detention and guilty pleas: If they cannot afford bail they must be guilty." *Criminal Justice Studies* 25.3 (2012): 265-278. For these reasons, Ms. Chen moves this Court for a revocation of the Magistrate Judge's detention order.

I.   **PROCEDURAL HISTORY**

On March 7, 2019, Ms. Chen was charged by a sealed Indictment with 10 counts of violating 18 U.S.C. § 1546(a) (Visa Fraud), one count of 18 U.S.C. § 1512(b)(3) (Obstruction of Justice), one count of 18 U.S.C. § 1505 (Obstruction of Justice), and one count of 18 U.S.C. § 1028A(a)(1) (Aggravated Identity Theft). Dkt. 27. The gravamen of the accusations in the Indictment is that Ms. Chen submitted fraudulent visa applications on behalf of international investors seeking EB-5 visas through the Golden State Regional Center, an entity owned and run by Ms. Chen's co-defendant Jianyun "Tony" Ye and an unindicted co-conspirator named Kai Robinson. The EB-5 visa program is designed to encourage substantial foreign investments in the United States; visa holders pledge to spend a minimum of $500,000 creating jobs in the United States.

On or about April 11, 2024, Ms. Chen was traveling to Kyrgyzstan on business when authorities there arrested her pursuant to a Red Notice based upon the sealed Indictment, and she was detained for approximately 11 months in a Kyrgyzstani prison before being extradited to the United States. On March 7, 2025, Ms. Chen made her initial appearance in the Northern District of California. Dkt. 121. On March 31, 2025, Ms. Chen, who was then represented by prior counsel, was ordered detained pending trial by the Magistrate Judge. Dkt. 134. On June 3, 2025, the Magistrate Judge denied Ms. Chen's motion for bail review which was filed by undersigned counsel. Dkt. 148.

II.  **SOCIAL HISTORY**

A.   **Childhood and Family**

Danhong "Jean" Chen was born on March 2, 1965, in Quanzhou City, China, an ancient Chinese port city. Her father, Chunlin Chen, was a headmaster at a local high school while her mother, Shuqing Huang, taught Chinese at a primary school. The youngest in her family, Jean has three older siblings. Two of her siblings, Xiaozhen and Tingshun, still reside in Quanzhou, where they formerly worked as a businessman and teacher, respectively. Her other sibling, Ruobo, lives in the United States and runs a restaurant in New Jersey.

   Growing up, the academic background of her parents afforded Jean with strong educational support and insightful guidance.  With their encouragement, Jean studied hard and was frequently elected as her school's most well-rounded student—virtuous, intellectual, and athletic.  Her father specifically instilled in her the importance of learning English, viewing it as an indispensable tool used to see and connect the world.  He, alongside her mom, likewise instilled in her the value and necessity of helping those around her.  This lesson would remain with her well into her adult years, as she looked to leverage her own abilities to make a difference.

   **B.**  **Education**

   Because of her parents' steadfast educational encouragement and her own intellect, Jean passed the required Chinese college entrance exam at the young age of sixteen.  Although her grades afforded her the opportunity to attend the most prestigious universities in China, she decided to enroll at Xiamen University, a renowned university that would allow her to stay closer to her family.  There, she majored in English language and literature, and participated heavily in the student union.  Four years later, in 1985, she graduated and, thanks to her outstanding academic performance and extracurricular involvements, received a position at Xiamen University as an assistant lecturer.

   Shortly thereafter, Jean decided that she wanted to pursue law school to help people and, in 1987, began her legal studies at the law school of her alma mater.  In 1991, she came to the United States to fulfill her childhood dream of traveling and experiencing the world.  Six years later, she earned her master's degree in law at Boston University School of Law.  Upon graduation, Jean was determined to stay in the United States, wanting to build a life here due to the freedom, democracy, and opportunity to practice law in a diversified country that embraces a wide variety of cultures.  She sought admittance to the New York Bar and, in 1998, became a licensed attorney.  In the same year, Ms. Chen relocated to the Bay Area from Boston to start her legal career.  She has since resided in the Bay Area.

      **C.**      **Legal Practice and Career**

After Jean's admittance to the bar, she decided to practice immigration law, as she believed it was the field that would allow her to help immigrants like herself and interact with people of different races, countries, and backgrounds. From 1999-2002 she worked as an immigration attorney for several law firms. She also joined the Asian Law Alliance, a nonprofit that supplies free legal services to the Santa Clara County community, where she provided pro-bono services for indigent immigrants in San Jose. In 2002, Jean founded her own law firm, the Law Office of Jean D. Chen. For the next 20 years, she helped clients with virtually all aspects of immigration law, assisting them with matters such as family immigration, employment-based immigration, H1-B work visa applications, international manager-based visa applications, and investment-based immigration. However, she intentionally did not practice in the field of political asylum, believing that the discipline frequently involved questionable behavior by attorneys who collaborated with their clients to make false stories to gain the beneficial outcomes. Jean was focused on building a law firm with integrity that would meet the needs of the community. *See* Exhibit 1, at 1-3 (May 15, 2025, support letter from Mr. Chadbourne Maurice Converse).

Jean's dedicated and compassionate work for the indigent, elderly, and disabled truly spanned across the country, positioning her as one of the most prominent Chinese immigration attorneys in the United States. Indeed, Jean estimates that her office has represented over 10,000 clients, employing several attorneys and an additional 10-25 paralegals at any given time. Importantly, these clients were not just numbers for Jean – they were real people with legal issues about whom she cared deeply, and the intentional, multifaceted, and empathetic nature of her representation reflected that.

After Ms. Chen was indicted in 2019, rumors, insults, and attacks rampantly flooded in through the Internet. Fortunately, clients who had been helped by Jean also started voluntarily to speak up for Jean by sharing their stories publicly, hoping to demonstrate who Jean was in their eyes. In one Internet article posted on March 12, 2020, a client shared that Jean helped her on two occasions, describing her as "not only experienced and capable of handling cases" but also

1  "extremely compassionate." *See* Exhibit 2, at 3-4 (translated article "What Attorney Danhong
2  Chen is like in the eyes of her clients."). The client explained that, when she was considering
3  applying for a permanent green card in the wake of a divorce, Jean provided her counsel for free.
4  And, when she later fled her home after a domestic violence incident in another state, Jean
5  personally picked her up from the airport, drove her to a motel, ensured she arrived in her room,
6  and explained to her the importance of her safety. Jean also declined the client's red envelope, a
7  cultural gesture to make up for the time and cost she had spent. After eight months, Jean's legal
8  representation helped the client succeed in her green card application, allowing her to start a new
9  family in the Bay Area. At the end of the article, the client calls for people who have been helped
10 by Jean to break their silence and confront the rumors.

      **D.    Community Service**

12  In addition to grounding her practice in service, Jean also made it a priority to give back to
13 the community outside of a legal context. She created her own family foundation, Foundation of
14 Dreams, which, from 2002 to 2023, provided resources and sponsorship for art activities and
15 hometown associations across the Bay Area. Some of these activities, such as cultural events,
16 musical performances, and festivals, were held at Stanford University, and Jean continued to be a
17 sponsor of them even after her departure from the U.S. in 2018.

18  Jean also made it a point to support the community she had left back home. For example,
19 in December 2018, Jean traveled with her daughter to Wen County, China, a community that was
20 devastated by the 2008 Sichuan earthquake, to participate in much-needed poverty alleviation
21 efforts. While there, she visited impoverished households in villages all over the county, speaking
22 with their children and presenting them with gifts. She, along with a few other members of the
23 larger Chinese community, also hosted a donation ceremony there in which over 350 quilts, 350
24 blankets, and other winter necessities were collected and gifted to the community. This represents
25 just one instance of her broader commitment to public service and civic engagement. *See* Exhibit
26 2, at 7-8 translated article "Three-Year Battle for Prosperity ☐ Chinese Americans in Wen County
27 Poverty Alleviation Event." (original source: https://www.sohu.com/a/285036049_120026151.).
28

### E. Marriage to Jianyun Ye

Jean married co-defendant Jianyun "Tony" Ye in 2002, and she gave birth to their daughter later in the same year. However, other than raising their daughter together, Ms. Chen did not find many values in common that she could share with Mr. Ye during their marriage. In addition, Mr. Ye focused his career on the real estate industry, while Ms. Chen was committed to her legal practice. In 2008, these differences led to Jean and Tony's separation, with Tony remaining in the family home during the day and staying elsewhere most nights. *See*, *e.g.*, Dkt. 109, at 30 ("he didn't like to go home, he always spent time with his team or friends, taking them out for dinner/ or a drink after work."). Almost ten years later, in 2017, the two formally divorced.

### F. The Present

Since arriving back in the United States in custody in March 2025, Jean has continued to be an enthusiastic and willing community member. She attends church in the Elmwood Jail every Sunday, and is the only inmate in her unit who requests weekly two-hour individual meetings with outside church members. In these meetings, Jean often explores possible involvement opportunities with the church upon her release, discussing, among other things, the church's schedule of events and open volunteer positions. Likewise devoted to using her time in custody to better herself, Jean has also enrolled in several self-help courses. She attended a "Building Connections" class, which she viewed as another outlet to stay involved in the community. By attending this 12-week "Self Leadership" training program, she learns how to lead, practice important communication skills, and follow through with the commitments. *See* Exhibit 3 (May 6, 2025 letter from Carry the Vision). Jean will remain engaged in Elmwood's various programs before her release.

Jean is grateful for the opportunity to be back in the Bay Area. After being released, she is looking forward to spending more time with her daughter. Jean will also go to her local church, St. Mark's Episcopal Church in Palo Alto. She is expecting to volunteer or work full-time for the ministry. *See* Exhibit 1, at 4 (May 14, 2025 support letter from CIC Ministries). She will continue her passion to help people in all available forms.

## III. DISCUSSION

### A. Legal Standard

Ms. Chen seeks revocation of the Magistrate Judge's March 31 and June 3 detention orders pursuant to 18 U.S.C. § 3145(b). Under the Bail Reform Act, the District Court must apply a *de novo* standard of review to the Magistrate Judge's detention order without deference to the Magistrate Judge's factual findings. *See, e.g., United States v. Koenig*, 912 F.2d 1190, 1191-92 (9th Cir. 1990).

### B. Ms. Chen has strong motives to stay in the United States to resolve this case.

Previously in these proceedings, in May 2021, Ms. Chen's co-defendant Mr. Ye pleaded guilty to 18 U.S.C §§ 371 and 1512(b)(3). Dkt. 94. On November 12, 2021, consistent with the government's recommendation, Mr. Ye was sentenced to 12 months in custody of the Bureau of Prisons and three years of supervised release. Dkt. 101, at 8 and Dkt. 107. In the change of plea and sentencing hearings for Mr. Ye, it was never alleged that Ms. Chen took part in the operation of Mr. Ye's business, Golden State Regional Center (GSRC). Rather, Ms. Chen's law firm's involvement was limited to preparing the immigration paperwork to facilitate visa applications for Mr. Ye's international business investor clients, as requested and based upon the representations made by Mr. Ye and his colleague Kai Robinson:

1) Before 2014, Ms. Chen already had a successful immigration law firm, and investment immigration practice (EB-5) was not the main focus of the firm. Mr. Ye affirmatively reached out to Ms. Chen to solicit her legal help. *See* Dkt. 109, at 12. ("Mr. Ye's ex-wife was very successful as an immigration attorney, and received a lot of flattering attention from the Chinese-American community. Mr. Ye wanted to be a part of that as well, and also wanted to be successful as a developer."); *Id*. at 26 ("As its peak, her law firm hires more than 20 people, and helped thousands of immigrants for visa applications, about 10% are for investment immigration . . .").

2) As a real estate development agent, Mr. Ye was cultivated GSRC and actively sought out foreign investors, wanting to advance his career as a development consultant. *Ibid*. He

1  contracted with Ms. Chen's firm to do the legal work for the investors that he himself
2  recruited to GSRC.  *Ibid*. ("I knew my wife was very experienced attorney who could
3  make that happen.").

4  3)  In Mr. Ye's sentencing brief, he described the job duties of GSRC by stating that his friend
5  "Kai Robinson is the legal owner of GSRC," and Mr. Ye "was in control of the bank
6  account for it and its projects."  *Id*.  Specifically, Mr. Ye admitted that "he involved
7  himself in the finances of GSRC, making himself a signatory on its bank accounts so that
8  he could manage how the money got spent," and that "he did control the funds."  *Id*. at 12.
9  Among these statements regarding work distribution, Ms. Chen's name was not involved –
10  there was no allegation then or now that Ms. Chen controlled the foreign investment funds.

Ms. Chen has been in custody for more than 14 months since she was arrested by Kyrgyzstani authorities in April 2024 pursuant to a Red Notice.  Mr. Ye has pleaded guilty and, in doing so, admitted that he was the actual controller and operator of GSRC.  Given Ms. Chen's relative involvement in the case and the length of time she has already spent in custody, she has strong motives to stay in the United States and participate in the defense of her case.  Prior to this prosecution, Ms. Chen was a successful and influential professional in the Bay Area.  Her law firm was lucrative.  She is incentivized to remain in the jurisdiction during and after the pendency of these criminal proceedings.

### C. Ms. Chen was not able to leave China until July 2023 due to Chinese Covid lockdown policies, and she suffered a serious knee injury in June 2023.

In the Magistrate Judge's initial March 31 detention order, she found that the government had satisfied its burden to demonstrate that Ms. Chen posed a flight risk that could not reasonably be mitigated by the release conditions then before the Court.  Dkt. 134, at 2.  Specifically, the Magistrate Judge found that, "despite what would appear to be strong familial and financial ties to the U.S., [Ms. Chen] elected not to return to the United States," Dkt. 134, at 2, and "has since evaded charges for over six years."  Dkt. 134, at 3.

In this Motion, the defense summarizes the timeline of significant events and activities from the past six years in the table below:

| Date | Event |
|---|---|
| Oct. 16, 2018 | Ms. Chen's mother fell and broke her hip in China. Ms. Chen made arrangements to go to China to care for her mother. |
| Oct. 18, 2018 | The SEC filed a civil complaint against Ms. Chen and Mr. Ye. |
| Oct. 18, 2018 | Ms. Chen traveled by train to Seattle and then to Vancouver. |
| Oct. 19, 2018 | Ms. Chen traveled to China, taking over her mother's care from her sister. |
| Nov. 16, 2018 | Ms. Chen traveled from China to Vancouver for a ski trip. |
| Nov. 20, 2018 | A criminal complaint was filed **against Mr. Ye only**. |
| Nov. 20, 2018 | Co-defendant Mr. Ye was arrested. |
| Nov. 26, 2018 | Ms. Chen traveled to London from Vancouver for business. |
| Jan. 13, 2019 | Ms. Chen traveled to Grenada through Germany. |
| Mar. 7, 2019 | The U.S. government filed the Indictment against both Mr. Ye and Ms. Chen. |
| Jan. 2020 | COVID lockdown began in China. |
| Mar. 2023 | COVID Lockdown was removed and Ms. Chen applied for Chinese Entry/Exit Visa. |
| Jun. 2023 | Ms. Chen broke her left knee and remained in the hospital for 3 months. One surgical procedure implanted a metal rod in her leg. |
| Jul. 7, 2023 | Ms. Chen was issued a visa valid until October 4, 2023. |
| Sep. 6, 2023 | Ms. Chen requested through a letter to the court that she be permitted to conduct the requested deposition in the SEC matter in either Japan, Hong Kong, Taiwan, Singapore, or Korea (Dkt. 178, 3:18-cv-06371-LB). |
| Sep. 21, 2023 | Ms. Chen was diagnosed with a blood clot in her leg after traveling. |
| Nov. 6, 2023 | Judge Beeler ordered that Ms. Chen's deposition in the SEC matter take place in San Francisco (Dkt. 187, 3:18-cv-06371-LB). |
| Nov. 28, 2023 | Ms. Chen was issued a travel visa valid until December 5, 2024. |
| Jan. 4, 2024 | Ms. Chen made another request to Judge Beeler for a protective order, documenting her inability to take long trips due to the newly-diagnosed blood clot (Dkt. 194, 3:18-cv-06371-LB). |
| Feb. 10, 2024 | Judge Beeler found that the medical issues precluded flying and thus agreed to change her earlier order for an in-person deposition in San Francisco (Dkt. 206, 3:18-cv-06371-LB). |
| Mar. 17, 2024 | Judge Beeler's order allowed Ms. Chen to conduct an in-person deposition at a place where she can travel safely (Dkt. 214, 3:18-cv-06371-LB). |
| Apr. 8, 2024 | Ms. Chen traveled to Kyrgyzstan. |
| Apr. 11, 2024 | Ms. Chen was arrested and detained by Kyrgyzstan authorities. |
| Apr. 15, 2024 | Ms. Chen's second surgery to remove the metal rod in her leg was originally scheduled for this date. |
| Jul. 31, 2024 | Ms. Chen's counsel notified the court that she was arrested and not able to conduct the deposition (Dkt. 230, 3:18-cv-06371-LB). |
| Mar. 7, 2025 | Ms. Chen made the initial appearance in the Northern District. |
| Mar. 31, 2025 | First detention hearing. |

The timeline unequivocally demonstrates that, during the time period of October 2018 and March 2025, Ms. Chen was not able to leave China due to that nation's Covid lockdown for more than three years, and she was later detained in Kyrgyzstan for 11 months. In addition, Ms. Chen

1  was not indicted until March 2019, and the Indictment was sealed.  The window left for her to
2  travel freely after the March 2019 sealed Indictment and COVID lockdown was a matter of
3  months, and not years.  Moreover, Ms. Chen broke her left knee in June 2023 and, on September
4  21, 2023, she was further diagnosed with a blood clot in the same area.  As a result, Ms. Chen's
5  doctor's instructed that she not travel for more than three hours at a time.  Dkt. 130 at 4; Exhibit A
6  to Dkt. 130 at 17 and 32.

   *Covid lockdown and travel restrictions in China between January 2020 to 2023*

8  As this Court is aware, China imposed a near-complete travel lockdown in January 2020
9  due to Covid-19 which was in effect until Spring 2023.  Once the lockdown was lifted, Ms. Chen
10 applied for an exit visa to enable her to travel outside of China. Dkt. 130 at 4.  Before receiving
11 the renewed visa, Ms. Chen was prohibited by law from leaving China because the original visa
12 she used to enter China expired on June 20, 2019.  *See* Exhibit 5, at 3 (Ms. Chen's
13 Accommodation Registration Form for Persons From Abroad).  Unlike in the United States,
14 foreigners who wish to leave China may not do so freely –like entry into China, foreigners must
15 have a valid travel visa and approval from the border inspection authorities in order to leave the
16 country.  *See* Exhibit 4, at 15 (Exit and Entry Administration Law of the People's Republic of
17 China, Article 27 ("Foreigners who exit China shall submit their exit/entry documents including
18 passports or other international travel documents to the exit/entry border inspection authorities for
19 examination . . . and may exit upon examination and approval.").  Notably, the exit and entry
20 visas are one combined travel document described by the statute as "exit/entry documents."
21 (original source: http://cs.mfa.gov.cn/wgrlh/bgzl/201307/t20130701_961342.shtml.).  Ms. Chen
22 did not receive her renewed visa until July 7, 2023, and it was valid until October 4, 2023.  *See*
23 Exhibit 6, Ms. Chen's U.S. passport.  However, because of the accident that broke her left knee in
24 June 2023, Ms. Chen continued to stay in China for to recover and prepare for the second surgery
25 that was originally scheduled for April 2024.

*Ms. Chen's medical condition since June 2023 and her communication with the District Court for the Northern District of California and the government*

During the March 31, 2025, initial detention hearing, the government argued that Ms. Chen refused to appear for her SEC deposition in San Francisco, "even though Judge Beeler, who is presiding over that case, did order that she appear for deposition." Dkt. 137 at 4. However, a review of the docket in the SEC case demonstrates that the government's accusation was incorrect, creating the misinterpretation that Ms. Chen was evading the jurisdiction of the court. In fact, as early as September 6, 2023, when Ms. Chen was still recovering from her foot injury, she requested through her attorney that a deposition be held in Japan, Hong Kong, Taiwan, Singapore, or Korea, citing her leg injury and her caregiving duty for her elderly mother. Dkt. 178, 3:18-cv-06371-LB. Notably, Japan, Korea, and Singapore have extradition treaties with the United States. On March 17, 2024, Judge Beeler issued a discovery order allowing Ms. Chen to have an in-person deposition at a place to which she could travel safely, or otherwise by video. Dkt. 214, 3:18-cv-06371-LB. The court record explicitly shows that, after the Covid travel restriction in China was lifted in/around July 2023, Ms. Chen, through her attorney, did communicate with the government and the court to arrange for her deposition within the parameters of what her medical conditions allowed. Ms. Chen did not evade the deposition, nor did she disobey Judge Beeler's order as alleged by the government.

On Apr. 8, 2024, Ms. Chen took a two hour and 10-minute flight to Kyrgyzstan. She was arrested on April 11, 2024. Dkt. 130, at 4. As previously noted, the second surgery to remove the steel wire in her leg had been scheduled for April 15, 2024. Dkt. 130, at 4; Exhibit A to Dkt. 130 at 5.

The timeline described here plainly demonstrates that Ms. Chen did not evade the jurisdiction of this court for six years, as the government has argued. This Court should not credit such a cursory and baseless assertion in determining whether Ms. Chen now poses a flight risk.

### D. Ms. Chen's medical condition requires immediate care

In June 2023, Ms. Chen was taken by ambulance to the emergency room in China after she fell and badly injured her left knee. At the hospital, she was diagnosed with a broken left knee and immediately underwent surgery. To repair the damage and help her bone heal, the hospital staff inserted steel wires into her lower leg and provided in-patient care over a three-month period. Shortly after her discharge, on September 21, 2023, Ms. Chen suffered a blood clot in her injured leg, a result of her knee being bent during a two-hour car ride. Exhibit A to Dkt. 130, at 32. Thereafter, Ms. Chen's medical team required her to limit travel to less than a three-hour period due to the increased likelihood of a blood clot at high elevation and her paternal history of blood clotting. Exhibit A to Dkt. 130, at 17.

In its March 31, 2025, detention order, the Magistrate Judge found that the medical records submitted by Ms. Chen were not clear regarding the immediate or urgent need for surgery, but did allow for the possibility of revisiting the issue in the following months. Dkt. 134, at 3 and 4. As demonstrated here, Ms. Chen's need for immediate medical care is inarguable. Ms. Chen's second surgery was delayed 11 months during her detention in Kyrgyzstan. Dkt. 130, at 4. More than three additional months have passed since Ms. Chen was booked into Elmwood Correctional Facility. In total, the surgery that was scheduled to take out the steel wires in her leg has been delayed for more than a year, causing Ms. Chen persistent pain and immobility. *See* Exhibit 7 (Ms. Chen's May 1, 2025, jail medical record). Such an abnormal sensation of a foreign object in her flesh has been following her like a shadow, causing Ms. Chen many sleepless nights.

Given the notoriously horrible conditions in the Kyrgyzstani prison, it is not surprising that Ms. Chen did not receive proper medical care to alleviate the pain in her left knee caused by the steel wires. *See* Exhibit A to Dkt. 130, at 4, and footnote 3 ("The abysmal conditions of Kyrgyzstani detention facilities, including their lack of medical care, are notorious. *See, e.g.*, U.S. Dep't of State, Kyrgyz Republic 2023 Human Rights Report 4 (2023) ('Prison conditions were harsh and sometimes life threatening due to food and medicine shortages, overcrowding, substandard health care, lack of heat, and mistreatment.'"). However, she should not suffer the

same medical fate or consequence here in the United States.  Upon Ms. Chen's return to the United States, she was seen by a doctor contracted by the jail who informed her that she would have to wait at least four months for surgery, which was not guaranteed.  Dkt. 130, at 4.  Seeking immediate medical treatment, Ms. Chen did not want to put herself on the waitlist for four months.  However, the government misinterpreted Ms. Chen's frustration about the timeline and availability of the surgery by alleging that Ms. Chen is "actually declining to get further care."  *See* Exhibit 8, Dkt 137 (March 31, 2025 hearing transcript, at 7).  Recently, this timeline has been extended even longer, with jail medical personnel stating that it will take "a few months" for her even to receive a consultation with a surgeon, and another "few months" after that for surgery to be scheduled.  *See* Exhibit 7 (Ms. Chen's May 1, 2025, jail medical record).   Ms. Chen expresses serious concerns about this timeline, as she has been experiencing significant pain in her left leg, right leg, and lower back due to the wires and her forced over-reliance on her other extremities.  *See* Exhibit B to Dkt. 130, at 16.  She also is very reasonably concerned about long-term disability and deformity if the wires that have remained in her leg for more than a year longer than they were originally supposed to prevent her bone from growing back properly.  Ms. Chen's medical need is indeed urgent.  Ms. Chen has already contacted her local hospital, Stanford University Hospital, which confirmed that once she is released surgery can be performed for her promptly.

    **E.**  **Ms. Chen did not abandon her familial and property ties when she left the U.S.**

    As this Court previously recognized, Ms. Chen's ties to the community are extensive and strong.  Although she was born in China, she has been a United States citizen for almost 20 years and began residing in the country in 1991.  Ms. Chen and her ex-husband built a life here for themselves and their daughter, who is also a U.S. citizen by virtue of her birth in the county.  At present, her daughter is a senior at the University of California, Berkeley.  Ms. Chen's daughter is one of the main reasons that she never intended to be out of the country for a prolonged period and was an overwhelming incentive for Ms. Chen to return.  She was devastated by their separation, much of which was due to extenuating circumstances and not because Ms. Chen intended to abandon her.  Indeed, being a mother has been one of Ms. Chen's greatest joys in life.  She is

1. dedicated to supporting her daughter, both academically and personally, and always has been. When her daughter was young, Ms. Chen spent every waking moment tending to her and ensuring that her needs were met. As her daughter entered her teenage years, Ms. Chen continued to be her main source of support, helping her with schoolwork and accompanying her to all her extracurricular activities. *See* Exhibit 1, at 11-12 (May 17, 2025, support letter from Evelyn Chenye). It was also Ms. Chen who instilled in her the importance of community service, which later prompted her daughter to establish a warm blanket drive that provided 152 villages in China with blankets in December 2018. *See* Exhibit 2, at 7-8, translated article "Three-Year Battle for Prosperity □ Chinese Americans in Wen County Poverty Alleviation Event." (original source: https://www.sohu.com/a/285036049_120026151.). Ms. Chen's daughter has written a letter to support Ms. Chen's release. *See* Exhibit 1, at 11-12, May 17, 2025 support letter from Evelyn Chenye.

Ms. Chen is also in close contact with her sister and her family who reside in New Jersey. They have also provided letters in support of Ms. Chen's release. *See* Exhibit 1, at 5-8 (May 4, 2025 support letter from Ms. Ruobo Chen and Ms. Daibao Wu). Ms. Chen's sister is willing to pledge the entire value of her real property in New Jersey for Ms. Chen's release.

In addition to Ms. Chen's familial ties to the United States, she is also an active member of many organizations and cultural networks in the Bay Area. *See* Exhibit 1, at 1-3 (May 15, 2025, support letter from Mr. Chadbourne Maurice Converse; at 9-10, April 30, 2025, support letter from Mr. Jinzheng Roy Tan). For example, as stated above, Ms. Chen founded Foundation of Dreams which, from 2002 to 2023, provided resources and sponsorship for art activities and hometown associations across the Bay Area. The sponsorship did not stop when Ms. Chen left the Bay Area in 2018, a continuing commitment that further demonstrates her strong ties to the community and her inclination to return to the Bay Area. Ms. Chen also hosted some of these events herself, many of which focused on bringing together the local Asian American community through art or charitable projects.

Finally, as previously disclosed at the March 31, 2025 hearing, Ms. Chen co-owns a house in the local community worth approximately $10 million, and she has been paying its substantial mortgage with her personal savings, loans, and retirement accounts.

### F. Proposed released conditions

1) A Ms. Chen shall deliver to the Clerk of Court a deed for her home, located at 90 Broadacres Road, Atherton, California 94027 ("the Atherton property"), with an estimated value per Zillow of $10,044,700.

2) Ms. Chen's sister, Ms. Ruobo Chen, shall deliver to the Clerk of Court a deed in trust for her real property, located at 111 US Highway 46, Fairfield, New Jersey, ("the NJ property"), which she purchased in 2024 for $520,000.

3) Ms. Chen's sister, Ms. Ruobo Chen, shall post $50,000 cash bail.

4) Ms. Chen shall be confined to the Atherton and may only travel for meetings with counsel, medical appointments, church attendance, and court appearances, all of which must be located in the Northern District of California. Any further travel must be approved by the United States Attorney's Office and the Court.

5) Ms. Chen shall be subject to electronic monitoring with curfew hours.

6) Ms. Chen shall surrender all travel documents, including any document which may be used to enter or exit any country, genuine or not. The government represents that it has possession of Ms. Chen's passports issued by the United States and the Commonwealth of Dominica. Ms. Chen shall not apply for or otherwise obtain any new travel documents, genuine or not.

7) Ms. Chen shall be subject to strict supervision by Pretrial Services and adhere to any other conditions imposed by the Court.

IV.     **CONCLUSION**

    For the foregoing reasons, Ms. Chen objects to the Magistrate Judge's detention orders, and moves this Court for a revocation of the detention orders pursuant to 18 U.S.C. § 3145(b).

DATED: June 17, 2025            Respectfully submitted,

                              Daniel B. Olmos
                              *Attorney for Defendant Danhong "Jean" Chen*